[No. A019142. First Dist., Div. Two. Jan. 21, 1983.]

In re WILLIAM ARCHIE FAIN on Habeas Corpus.

## COUNSEL

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Roger E. Venturi and Anthony L. Dicce, Deputy Attorneys General, for Appellant.

Robert Y. Bell for Respondent.

## OPINION

**MILLER, J.**—We consider whether public outcry can be used as a basis for rescission of a prison inmate's parole date.

### Background Facts

Respondent William Archie Fain (hereafter Fain) is an inmate at San Quentin Prison. He has served 15 years of a life term. In 1967 he was convicted of first degree murder, three counts of forcible rape, one count of forcible sex perversion, two counts of kidnaping, and one count of attempted kidnaping, stemming from three separate criminal episodes in June of that year. (*People* v. *Fain* (1969) 70 Cal.2d 588, 592-595 [75 Cal.Rptr. 633, 451 P.2d 65].) The jury fixed the punishment at death (*id.,* at p. 592) but the Supreme Court, while affirming his convictions, ordered a new penalty trial because of *Witherspoon* error (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]). (*People* v. *Fain, supra,* 70 Cal.2d at p. 601.)

After remand to the Stanislaus County Superior Court, Fain was returned to that county and confined in its jail pending the penalty retrial. In July 1969, while the retrial was still pending, Fain and five fellow prisoners escaped from the county jail. Fain was recaptured less than two days later. He moved for a change of venue of the penalty retrial, claiming he could not receive a fair and impartial trial in Stanislaus County and citing the pervasive publicity attending both his 1967 crimes and the 1969 escape. (*Fain* v. *Superior Court* (1970) 2 Cal.3d 46, 50-51 [84 Cal.Rptr. 135, 465 P.2d 23].) This motion was granted. (*Id.,* at p. 54.) Meantime, he was convicted of escape, kidnaping and two counts of armed robbery arising from the escape; these convictions, with the

exception of the kidnaping count, were affirmed by the Court of Appeal. (*People* v. *Fain* (1971) 18 Cal.App.3d 137 [95 Cal.Rptr. 562].)

At Fain's penalty retrial, which was eventually conducted in Sacramento County Superior Court, a jury fixed his punishment at life imprisonment on the 1967 murder count. (*In re Fain* (1976) 65 Cal.App.3d 376, 382 [135 Cal.Rptr. 543], hereafter *Fain I.*) That court eventually ordered the sentences on the multitude of other offenses committed in 1967 and 1969 to run concurrently with the life sentence imposed for the 1967 murder. (*Id.,* at p. 382.)

Fain was originally granted a parole release date of June 18, 1976, by a two-person panel of the then-Adult Authority, predecessor to what is now called the Board of Prison Terms (hereafter board), appellant herein. His imminent release received extensive press publicity in and near Stanislaus County, and aroused considerable public opposition, much of which was communicated to the authority and to legislators representing the area. (65 Cal.App.3d at p. 384.) A month short of Fain's release date, the chairman of the Adult Authority convened a three-person "Review Committee," which issued a "summary report" calling for a rescission hearing to determine whether the scheduled parole date was appropriate "in light of the gravity of the commitment offenses, the inmate's prior criminal history, and his subsequent conduct while in the custody of the Department of Corrections." (*Id.,* at pp. 384-385, fn. 6.)

On Fain's petition, the Marin County Superior Court ordered the Adult Authority not to conduct the scheduled rescission hearing, and ultimately ordered Fain's release, holding that the Authority was without power to review a decision which had become final under applicable rules, and that in any event there was no basis under applicable statutory provisions and rules for revocation of a parole. (*Id.,* at pp. 386-388.)

This court, on appeal from that order, disagreed with the trial court on both counts. (*Id.,* at p. 388.) We observed: "Any deliberative body—administrative, judicial, or legislative—has the inherent power to reconsider an action taken by it unless the action is such that it may not be set aside or unless reconsideration is precluded by law. [Citations.]" (*Id.,* at p. 389.) We found no such preclusion in then-existing statutes and rules. (*Id.,* at pp. 390-391.) In addition, we opined that the trial court's finding as to lack of cause for rescission was based upon an erroneous interpretation of the authority's rules, which listed as causes for rescission: " ' . . . (1) Disciplinary conduct by the inmate; (2) Psychiatric deterioration of the inmate; and (3) Any new information which indicates that parole should not occur.' " (*Id.,* at p. 392.) We stated that these grounds were not exclusive, and even if they were that public outrage, while it "did not in itself command rescission of his parole," nevertheless was " 'new

information which indicates that parole should not occur' and which required the authority's consideration of that possibility in compliance with its rules. [Citation.]" (*Id.*, at p. 393.) We concluded, however, that consideration of the existence of cause for rescission was premature, since "[w]hether there is cause for rescission remains to be decided by the authority at the rescission hearing . . . ." (*Id.*, at p. 394.)

Thereafter, in April 1977, the board rescinded the 1976 parole date and established a new parole date of April 16, 1983, which was later advanced because of credit calculations to January 19, 1982. In granting rescission, the board found that in setting the 1976 parole date, it had committed "fundamental error" and had abused its discretion.

When it set that 1982 date, the board found that Fain "appears to be a suitable candidate for release on parole, and . . . does not apear to represent an unreasonable risk of danger to society."

The panel noted "the consistent, exceptional, laudatory nature" of reports on Fain's prison progress and his "realistic parole release program," including support from his wife and a minister.

In late 1981, as Fain's release drew near, a renewed storm of public outcry arose over his imminent release. The board received petitions containing 62,500 signatures, resolutions of four city councils and three boards of supervisors, a petition of the Attorney General[1] and a Senate Concurrent Resolution of the California Legislature, all requesting rescission of the parole date.

This outcry resulted in a board hearing on February 17, 1982, to determine (1) whether Fain's parole should be rescinded because of "extraordinary public outcry" or (2) whether the prior board panels had abused their discretion resulting in the improvident granting of a parole date. The board found neither abuse of discretion nor fundamental errors resulting in the improvident granting of a parole date. But it nevertheless rescinded Fain's parole, finding that "there is widespread, unprecedented and extraordinary public outcry in opposition to Fain's release, that this public outcry is new information, and that the quantity and quality of this new information indicate that Fain should not be paroled at this time."

---

[1] It was at about this time that the Attorney General, who had earlier opined—on March 29, 1977, after the *Fain I* decision—that public outrage has "limited relevance to the decision to rescind" and had encouraged the board "to avoid reliance on public outcry as a cause to rescind," while maintaining that outcry "validly prompted the [board] to look at the case and can validly prompt great change in the parole release plan," did an about-face. While reaffirming that "there must be a showing of error in the decision to grant parole," the Attorney General's office in a November 2, 1981, letter to the chairman of the Board of Prison Terms advised that a showing of error "may exist where the public hostility expressed concerning Mr. Fain's imminent release amounts to new information which indicates that parole should not occur."

Fain exhausted his administrative remedies and, after all internal appeals were denied, filed the instant petition for writ of habeas corpus. The trial court herein, while considering the public outrage over Fain's release "perfectly understandable" considering the "heinous crimes" he had committed, granted the writ. It held that the opposition to Fain's release did not constitute "new information," since the board received 18,000 signatures in 1976 opposing Fain's release and "the only thing 'new' is the fact that there were more signatures on the 1981 petitions."

The court noted that "the record shows that the Board has continuously been aware of the 'public outcry,' even subsequent to its 1977 decision setting the existing parole date." It found the discussion in our 1976 opinion regarding public outcry "dictum" indicating that "public outcry may be considered as cause granting to the Board authority to reconsider parole, *if some other basis applies.*" (Italics added.) The trial court found it "more than interesting to note that when the Board rescinded petitioner's first parole date in 1977, its basis for acting was not the clear public outcry that then existed, but their finding an abuse of discretion on the part of the prior Board panel, in that 'insufficient consideration was given to all factors and crimes' in the case."[2]

The board appealed the trial court's grant of habeas corpus, simultaneously seeking a stay of the decision, which was granted by this court. The Supreme Court denied Fain's effort to vacate the stay on a four-to-three vote (order denying hearing, filed Oct. 21, 1982). Fain thus remains incarcerated pending our decision.

*Discussion*

## I. *Res Judicata*

Fain contends that the board decision which rescinded the 1976 parole date and resulted in a 1982 parole date is binding under res judicata principles

---

[2]The trial court's finding in this regard is clearly correct. The Attorney General advised the board in 1977 of *six* possible reasons for rescinding parole and finding an abuse of discretion in the setting of the 1976 parole date: "*First,* the panel designated the minimum number of months for Fain's vicious murder. *Second,* the panel designated the minimum increment for Fain's two kidnappings, and his sexual perversion by force. *Third,* the panel gave a zero upward adjustment for Fain's attempted kidnapping. *Fourth,* the panel apparently disregarded two of Fain's three forcible rapes. *Fifth,* the panel gave no increment whatsoever for any of the 1969 offenses connected to Fain's escape, explaining that he was 'minimally involved'—an apparent contradiction to the facts recited in *People* v. *Fain,* 18 Cal.App.3d 137 (1970). And *sixth,* at least the printed comments of the panel are totally involved in the factor of in-prison conduct and give no discussion to the seriousness of the crimes, their brutality, damage to the victims." (Italics in original.)

because the board successfully defended the decision against habeas corpus attacks.

We do not agree, and Fain's arguments do not support his contention. It is true that res judicata applies to a final judgment *granting* habeas corpus relief. (*In re Crow* (1971) 4 Cal.3d 613, 622 [94 Cal.Rptr. 254, 483 P.2d 1206]; Cal. Criminal Law Practice (Cont.Ed.Bar May Supp. 1980) § 21.127, p. 360 ["if the order granting the writ is affirmed on the People's appeal, . . . it becomes conclusive and the doctrine of res judicata applies"].)

It does not follow, however, that res judicata principles apply to a case such as this one where an inmate has *unsuccessfully* attacked a parole rescission in a habeas corpus proceeding. The Attorney General correctly pointed out below that parole rescission may occur even though a prior parole date has been granted. A typical parole rescission is based upon prison misconduct or some other *cause* for rescission. *If such cause exists,* it cannot seriously be contended that the parole board would be foreclosed from rescinding because it had previously won affirmance of a decision postponing a scheduled parole. The real question, then, is whether such cause exists—whether "new information" justifying rescission of the 1982 parole date exists. "The doctrine of *res judicata* was never intended to operate so as to prevent a re-examination of the same question between the same parties where, in the interval between the first and second actions, the facts have materially changed or new facts have occurred which may have altered the legal rights or relations of the litigants. [Citations.]" (*Hurd* v. *Albert* (1931) 214 Cal. 15, 26 [3 P.2d 545, 76 A.L.R. 1348]; see *State Farm Ins. Co.* v. *Duel* (1945) 324 U.S. 154, 162 [89 L.Ed. 812, 818-819, 65 S.Ct. 573]; *Cox* v. *State Social Welfare Board* (1961) 193 Cal.App.2d 708, 719 [14 Cal.Rptr. 776]; *Hasselbach* v. *Dept. Alcoholic Bev. Control* (1959) 167 Cal.App.2d 662, 665 [334 P.2d 1058]; *People* v. *Spring Valley Co.* (1952) 109 Cal.App.2d 656, 668 [241 P.2d 1069] [all citing and approving *Hurd*].) (See also 4 Witkin, Cal. Procedure (2d ed. 1971) Judgment, § 212, p. 3349.)

Thus, the prior court actions following the 1977 decision are clearly not res judicata. We cannot agree, however, with the Attorney General's equally illogical argument that since the prior decisions upheld rescission, Fain is foreclosed from attacking the 1982 rescission. This argument flies in the face of the board's finding that the vehement outcry against Fain's release this year was "new information." If the issue of public outcry was decided in 1977, it can hardly be "new information" five years later. If it was not decided in 1977, or if the facts have materially changed since then, the matter can hardly be res judicata.

Thus, we proceed to the merits of the present action.

## II. *Public Outcry Does Not Constitute Cause for Rescission*

Penal Code section 3063 provides that no parole shall be suspended or revoked without cause, "which cause must be stated in the order suspending or revoking the parole." This section applies to parole rescission. (*Fain I, supra,* 65 Cal.App.3d 376, 388.) The board's rules likewise require cause, with section 2450 (Cal. Admin. Code, tit. 15, § 2450) requiring "good cause" for rescission.

The question is whether public outcry constitutes "cause" or "good cause" within the meaning of those provisions.

We begin by observing that *Fain I* does not provide a definitive answer to that question. The issue there was whether the Adult Authority should have been permitted to reconsider the previously established parole date. As we observed in that case, consideration of the existence of cause for rescission was premature. (*Fain I, supra,* 65 Cal.App.3d at p. 394.) At most, that case stands for the proposition that public outcry may justify review of a decision fixing a parole date; it certainly does not support the proposition that continuing public outcry provides a basis for indefinite postponement of a prisoner's otherwise-justified parole. It is therefore appropriate to review afresh the principles that must guide our analysis.

### A. *Statutory Framework*

A number of statutes and administrative rules guide the exercise of the board's discretion in granting and rescinding parole dates. The crucial rule has not changed, although it has been renumbered, since the decision in *Fain I.* Essentially, a parole date of a life prisoner may be "postponed or rescinded for good cause at a rescission hearing." (Cal. Admin. Code, tit. 15, § 2450; cf. *Fain I, supra,* 65 Cal.App.3d at p. 392.)

Chapter 8, article 3 of the Penal Code (§ 3040 et seq.) sets forth relevant parole-setting and rescinding rules. Section 3040 gives the board the power to parole prisoners. Section 3041 provides that release dates for non-DSL prisoners (such as Fain) shall be set in a manner "that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." Section 3041 directs the board to establish criteria for setting parole release dates and in doing so to consider "the number of victims of the crime for which the prisoner was sentenced and other factors in mitigation or aggravation of the crime." (§ 3041, subd. (a).) The board "shall set a release date unless it determines that the gravity of the current convicted offense or of-

fenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual . . . ." (§ 3041, subd. (b).)

Section 3041.5 sets forth procedural rights in connection with hearings setting, postponing or rescinding parole dates. The prisoner is permitted to (1) review his or her file and enter a written response to material therein; (2) be present, ask and answer questions, and speak on his own behalf; (3) have someone designated by the Department of Corrections present to "insure that all facts relevant to the decision be presented," unless counsel is required by some other provision of law; (4) request and receive a record of the proceeding; (5) request witnesses to attend the hearing, "and they shall be called unless the person conducting the hearing has specific reasons to deny this request" (Pen. Code, § 2932, subd. (c)(3)); and question all witnesses (*id.,* subd. (c)(4)).

Within 10 days of any board action resulting in rescission of a previously set parole date, the board shall send the prisoner a written statement setting forth the reason or reasons for its action, and must within six months set the prisoner's parole release date in accord with sections 3041 and 3041.5. (§ 3041.5, subd. (b)(4).)

Section 3041.7 provides the right to counsel at parole rescission hearings for life sentence prisoners such as Fain. The Board of Prison Terms "shall provide by rule" for inviting the prosecutor of the county from which the inmate was committed. The prosecutor must be notified at least 30 days prior to the hearing date. Significantly, the prosecutor or his representative "shall be the sole representative of the interests of the people." (*Ibid.*)

Section 3042 mandates notice before parole-setting meetings to various interested persons such as the trial judge, defense attorney and prosecutor, investigating law enforcement agency, and, in the case of a prisoner sentenced to life for first degree murder, "written notice to the next of kin of the person murdered" where such notice was requested.

Citing section 3042, the board's rules (Cal. Admin. Code, tit. 15, § 2028) state: "Any person may submit information concerning any prisoner or parolee and the offenses. Written comments from the public shall be directed to the executive officer of the board who shall forward the comments to the prisoner's or parolee's central file for the consideration of future hearing panels. [¶] (b) . . . Any person may submit information which was not available to the hearing panel or comments on a proposed decision. Comments or new information shall be submitted to the executive officer who shall forward the information to the decision review unit and to the prisoner, parolee, district attorney and

prisoner or parolee's attorney. The comments shall be incorporated into the hearing record and considered before the decision is final."

Similarly, the newly enacted "Victim's Bill of Rights" gives the victims of a prisoner's crimes the right to express their views at parole eligibility hearings, and requires the board to consider the victim's views in deciding whether to release the inmate, and to include in the board's report "a statement of whether the person would pose a threat to public safety if released on parole." (Pen. Code, § 3043.)

Section 3046 tells the board to consider statements and recommendations submitted by the judge, district attorney and sheriff, and recommendations of other persons "interested in the granting or denying of such parole."

Section 2451 (Cal. Admin. Code, tit. 15, § 2451) sets forth 12 specified types of disciplinary conduct—none present here—which justify rescission. (*Id.*, subd. (a).) Subdivision (b) of section 2451 specifies "psychiatric deterioration" as a ground for rescission, and finally subdivision (c) allows rescission based on "[a]ny new information which indicates that parole should not occur," including several illustrative examples such as an inability to meet a special condition of parole or "fundamental errors occurred resulting in the improvident granting of a parole date." It is subdivision (c)'s "new information" clause which the board relied upon to justify rescission based upon "public outcry."

We observe that nothing in the applicable statutory provisions or rules suggests that public outcry, per se, may be considered as a basis for rescission of parole.

Our dissenting colleague suggests that allowing the board to receive public comment without using it as a cause for rescission reduces the reception of public input to a "meatless bone tossed to the public." (Conc. and dis. opn., *post*, at p. 316.) This eloquent criticism misses the point. We distinguish—and surely the Legislature meant to distinguish—between emotion and information, between a mere show of hands in opposition to a prisoner's release anywhere, any time, and specific information brought forward by the public relevant to the board's determination. The former, as we more fully discuss in the context of the applicable case law *infra,* is not constitutionally cognizable. The latter, of course, can and should play a role in the board's decision, and the Legislature has so provided. In this light, if we may borrow the dissent's analogy, the Legislature has seen fit to ensure that the public may provide the board with food for thought, without devouring the inmate's constitutional rights.[3]

---

[3]Moreover, to the extent the victim's Bill of Rights requires public comment—as the dissent notes—serious ex post facto questions would be raised by the application of new legislation

## B. *California Case Law Involving Factors in Parole Decision*

In a leading case, the California Supreme Court has declared: " 'In determining whether the privilege of parole shall be granted a prisoner, that authority is not guided solely by the good conduct of the prisoner while incarcerated. The nature of his offense, his age, his prior associations, his habits, inclinations and traits of character, the probability of his reformation and the interests of public security are all taken into consideration.' " (*In re Schoengarth* (1967) 66 Cal.2d 295, 300 [57 Cal.Rptr. 600, 425 P.2d 200].)

A good summary of the factors to be taken into account in making the parole determination appears in *In re Stanley* (1976) 54 Cal.App.3d 1030, 1037 [126 Cal.Rptr. 524]: "Thus, early in the history of the parole system, the California Supreme Court emphasized the significance of acceptable conduct in prison and the individual's potential for reclamation. Later, the court noted additional factors—the nature of the prisoner's offense, his age, his prior associates, his habits, inclinations and traits of character. [Citations.] The court also took note of a 1952 declaration of Adult Authority policy, declaring that in-prison conduct and potential for rehabilitation were of ' "paramount importance." ' (*In re Minnis* (1972) 7 Cal.3d 639, 645 [102 Cal.Rptr. 749, 498 P.2d 997].) Most recently, the court has observed: '[The parole] power enables the Authority to give recognition to a prisoner's good conduct in prison, his efforts toward rehabilitation, and his readiness to lead a crime-free life in society.' (*In re Rodriguez* (1975) 14 Cal.3d 639, 652 [122 Cal.Rptr. 552, 537 P.2d 384].) Parole decisions, the court has stated, 'are based in large measure on occurrences subsequent to the commission of the offense.' "

Along these same lines, the Supreme Court reemphasized in *In re Dunham* (1976) 16 Cal.3d 63, 66 [127 Cal.Rptr. 343, 545 P.2d 255], in the parole revocation context, that, " 'Any official or board vested with discretion is under an obligation to consider *all* relevant factors. . . .' " (Italics in original.)

Finally, *In re McLain* (1960) 55 Cal.2d 78, 87 [9 Cal.Rptr. 824, 357 P.2d 1080], teaches us that the denial of liberty "may not be made to turn upon mere whim, caprice, or rumor."

Nothing in these cases suggests that public outcry may be considered as grounds for rescission of parole. On the contrary, reliance upon outcry would appear inconsistent with the emphasis in these cases upon consideration of in-prison conduct and potential for rehabilitation (*In re Stanley, supra,* 54 Cal. App.3d 1030, 1037), and exclusive reliance upon public outcry would appear

---

governing Fain's case. See *In re Stanworth* (1982) 33 Cal.3d 176 [187 Cal.Rptr. 783, 654 P.2d 1311], more fully discussed in footnote 6, *infra.*

inconsistent with the mandate that all factors be considered. (*In re Dunham, supra,* 16 Cal.3d 63, 66.)[4]

## C. *Constitutional Considerations*

Interpretation of the term "cause" in the relevant statutory provision and board rule to include public outcry would not only strain the statutory framework and disregard settled precedent, it would pose a formidable constitutional question as well, under the due process clauses of both federal and state Constitutions.

Public opinion plays a fundamental role in our democratic society, but its role is limited to the formulation of rules, not their application in particular instances. As regards legislative acts, the federal Constitution recognizes that distinction by prohibiting bills of attainder—legislation aimed at punishing particular individuals. (U.S. Const., art. I, § 9, cl. 3.) As regards judicial acts, or (as in this case) acts by administrative agencies exercising judicial functions, the same principle applies. It is within the power of the people, acting in accordance with the Constitution, to define offenses, establish sanctions, and fix the procedure by which determinations of guilt and punishment are to be made. It would offend our most basic concepts of justice, however, if the decision of guilt or innocence of the accused, or the length of his sentence, were allowed to depend upon public reaction in a particular case. As the trial court put it, "Unlike the Roman circus, where the roar of the crowd would determine the life or death of the gladiator, our community cannot survive without rules, and whether the object of the justice system is the best of us or the worst, those rules must apply fairly to all . . . ."

It is true that the United States Supreme Court has recognized that "the administrators of our penal systems need considerable latitude in operating those systems" (*Jago* v. *Van Curen* (1981) 454 U.S. 14, 18 [70 L.Ed.2d 13, 18, 102 S.Ct. 31, 34]), that a state "may be specific or general in defining the conditions for release and the factors that should be considered by the parole authority" (*Greenholtz* v. *Nebraska Penal Inmates* (1979) 442 U.S. 1, 8 [60 L.Ed.2d 668, 676, 99 S.Ct. 2100]), and that "there is no prescribed or defined combination of facts which, if shown, would mandate release on parole." (*Ibid.*)

---

[4]It might be argued that the emphasis on rehabilitation in these cases conflicts with the emphasis in the current determinate sentencing law on punishment. (Pen. Code, § 1170.) The very recent case of *In re Stanworth, supra,* 33 Cal.3d 176, however, holds that it is an ex post facto violation to consider the parole of someone sentenced under the Indeterminate Sentence Law (ISL) using only determinate sentencing law (DSL) guidelines. Thus, as applied to Fain, the case law that evolved under the ISL and the regulations thereunder retain vitality.

Grounds for a constitutional claim may, however, be found in "statutes or other rules defining the obligations of the authority charged with exercising clemency." (*Connecticut Board of Pardons* v. *Dumschat* (1981) 452 U.S. 458, 465 [69 L.Ed.2d 158, 165-166, 101 S.Ct. 2460].) And, during the last 10 years there has been a substantial expansion in the procedural rights afforded an inmate in the parole process.

In *Morrissey* v. *Brewer* (1972) 408 U.S. 471 [33 L.Ed.2d 484, 92 S.Ct. 2593], the United States Supreme Court held that proceedings for parole revocation must conform to minimum due process requirements, including a hearing upon written notice, with disclosure of the evidence, a qualified right of confrontation, and a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.

Our state Supreme Court has held that due process requires similar procedures for rescission of parole, since a prisoner's liberty rights are implicated. (*In re Prewitt* (1972) 8 Cal.3d 470, 474 [105 Cal.Rptr. 318, 503 P.2d 1326]; see also, *In re Sturm* (1974) 11 Cal.3d 258, 272 [113 Cal.Rptr. 361, 521 P.2d 97] [in the absence of a definitive written statement of reasons for denying parole at a regularly scheduled parole hearing, Adult Authority effectively deprives inmate of procedural due process]; *Gee* v. *Brown* (1975) 14 Cal.3d 571, 573 [122 Cal.Rptr. 231, 536 P.2d 1017] [conditional right to counsel exists at parole rescission hearings].) These due process guarantees would be virtually meaningless under the rationale offered by appellant in this case. Respondent, no matter what the evidence might show as to factors rationally related to his release, could be kept in prison for the rest of his life so long as those determined to do so were able to obtain sufficient signatures on petitions, or votes for resolutions, each time his release date came under review. "The presence of a large measure of discretion in a parole system . . . does not alter the fundamental due process limitation against capricious decisionmaking. A legislative grant of discretion does not amount to a license for arbitrary behavior." (*Block* v. *Potter* (3d Cir. 1980) 631 F.2d 233, 236.) "When the Parole Board bases its decision on factors that bear no rational relationship to rehabilitation or deterrence, it transgresses the legitimate bounds of its discretion." (*Id.,* at p. 237.)

The trial court's condemnation of reliance upon public outrage is supported by the only authorities we have been able to find which have dealt with this issue. In dictum, the New Jersey Supreme Court declared, in a case dealing with the constitutionality of requiring restitution as a condition of parole, "[I]t is undeniable that public outrage over an imminent parole determination, such as that which has occurred in this case, has no place in a parole proceeding and

is to be given no weight in a parole decision." (*In re Trantino Parole Application* (1982) 89 N.J. 347 [446 A.2d 104, 119].)

The issue involved herein was dealt with at greater length in *Winsett* v. *McGinnes* (3d Cir. 1980) (en banc) 617 F.2d 996, cert. den. *sub nom. Anderson* v. *Winsett* (1981) 449 U.S. 1093 [66 L.Ed.2d 822, 101 S.Ct. 891]. There, Delaware prison officials, because of their fear of adverse public reaction and legislative reprisals against the prison system, denied an inmate's work release. The court held that the inmate's procedural due process rights had been violated. The court's reasoning is instructive and persuasive: "Although discretion is vested in the prison authorities to grant or deny work release, that discretion must be exercised consistently with the purpose and policy behind work release. . . . We conclude that Winsett had a protectible liberty interest in work release because he met all eligibility criteria under the Delaware regulations and the considerations influencing the discretionary ·denial of work release, namely concern for public reaction and fear of legislative reprisals, were outside the legitimate bounds of the prison officials' discretionary power. . . . If the prison officials considered the extraneous criteria of public opinion and legislative reaction, the normal procedure for considering work release applications was distorted to Winsett's detriment." (*Id.,* at pp. 1007-1008.) In a footnote, the court declared that considerations of public reaction "could be dangerous to and destructive of procedural due process. Public opinion against a prisoner could be orchestrated on notes and chords as discordant as race, creed, ethnic background, labor activities, political views, or other factors having no pertinence to a prisoner's rehabilitative progress and fitness to participate in a work release program. [¶] We do not deny that society has a legitimate interest in insuring the punishment of crime, especially serious felonies. But society also recognizes that more often than not there is a terminal point to retribution and that it should, as Delaware has done, concern itself with the rehabilitation and return of the prisoner to a productive role in the community. . . . [W]hen discrepant treatment between prisoners is purposeful and participation in work release is denied to one prisoner only because of the Superintendent's amorphous perception of public opinion, then the laudable purposes of a structured program are skewed by a basic lack of fairness. If work release for a prisoner is not determined solely on the basis of the statutory and regulatory criteria established by the state but may also depend upon what may be perceived public reaction to it, these extraneous considerations can cut both ways. Not only can worthy work release applications be thereby denied but similar influences may compel admittance to the program of undesirable and unqualified applicants." (*Id.,* at p. 1008, fn. 14.) (See also *Farries* v. *United States Board of Parole* (7th Cir. 1973) 484 F.2d 948, 949 [prisoner may not discriminatorily be denied parole on account of religious prejudice]; *Freeman* v. *Schoen* (D.Minn. 1974) 370 F.Supp. 1144 [failure to submit name of petitioner, who met all requirements for parole release to live-in, community

based residential program, on ground of political sensitivity and adverse community sentiment denied him due process].)

Finally, a case decided last year by the Ninth Circuit offers pertinent commentary. In *Sellars* v. *Procunier* (9th Cir. 1981) 641 F.2d 1295, 1303, cert. den. (1981) 454 U.S. 1107 [70 L.Ed.2d 644, 102 S.Ct. 678], the court held that absolute immunity from civil suits is required for parole board officials. The court reasoned: "Judges enjoy absolute immunity from civil rights suits in order to keep the judicial decision-making process pristine. . . . When he or she weighs the merits of a case, we do not want the scales to be tipped by fear of litigation. . . . [¶] We believe that the same degree of protection must be accorded to the decision-making process of parole board officials. *Just as the decision-making process of judges must be kept free from fear, so must that of parole board officials.* Without this protection, there is the same danger that the decision-maker might not impartially adjudicate the often difficult cases that come before them." (Italics added; accord *United States* v. *Irving* (7th Cir. 1982) 684 F.2d 494, 496-497.) Underlying the court's decision was its confidence that inmates are still protected from "capricious or arbitrary decisions" by California law regulating the parole process. (641 F.2d at p. 1303.) We would undermine this salutary protection by permitting public outrage to determine whether parole is granted.

Well established principles of statutory interpretation require us to construe statutes, where possible, in a manner consistent with the Constitution. (See, e.g., *California Housing Finance Agency* v. *Elliott* (1976) 17 Cal.3d 575, 594 [131 Cal.Rptr. 361, 551 P.2d 1193].) On the basis of those principles, as well as on the basis of the statutory framework and persuasive precedent we have discussed, we conclude that public outcry, per se, may not constitute cause for rescission of a parole date.

### D. *Board's Decision*

The genesis of the board's decision might be said to be the opinion of this court in *Fain I,* where we held that newly discovered public outrage was "new information" which required *consideration* of parole rescission. (65 Cal.App. 3d at p. 393.) In a footnote, the court commented that the board's developing awareness of public hostility to Fain's release was " 'new information which indicates'—or not, depending upon the result to be reached in the rescission proceedings which the trial court foreclosed—that his 'parole should not occur' because it reaches such pertinent questions as whether he may be assimilated into society, and indeed whether he will be personally safe, outside of prison." (*Ibid.,* fn. 14.)

Thereafter, in 1977, the board proceeded to rescind Fain's 1976 parole date, but *not* on the basis of public outrage. The board found "a significant abuse of

discretion and commission of fundamental error, resulting in the improvident granting of a parole release date."[5]

As to the instant parole rescission decision, the board took pains to disclaim any abuse of discretion by the prior parole-granting panels. These panels "did not abuse their discretion and did not commit fundamental errors resulting in the improvident granting of a parole date." Instead, the board found that "widespread unprecedented and extraordinary public outcry expressed in this case is new information of such force and magnitude as to constitute good cause for the rescission of Fain's parole date." The board analyzed, at some length, the nature and form of the outcry, and the means by which 62,500 signatures were gathered on petitions opposing Fain's release.

Our dissenting colleague finds fault with our "evident skepticism as to whether the board in fact relied on anything *but* public opposition, per se." He suggests that we have "overlooked the doctrine of separation of powers, which precludes judicial inquiry into the motivation or mental processes of the board and speculation as to what might have been in the minds of the individual board members, except as might be shown by the official action taken." (Conc. and dis. opn., *post* at p. 316.) To the contrary, the board openly proclaimed its reliance on public outcry and its finding that it had not abused its discretion in setting a parole date. Thus, the cases upon which the dissent relies—involving *legislative* action which was alleged to be the result of improper considerations—are inapposite. (See *City and County of San Francisco* v. *Cooper* (1975) 13 Cal.3d 898 [120 Cal.Rptr. 707, 534 P.2d 403].) "[I]t is . . . clear that we do not engage in the proscribed 'inquiry into the motivation' for executive action when we perceive its purpose to be obvious on the face of the action itself." (*Mandel* v. *Hodges* (1976) 54 Cal.App.3d 596, 609 [127 Cal.Rptr. 244, 90 A.L.R.3d 728].)

The trial court aptly exposed the error involved in reliance upon naked public outcry. "The Legislature has seen fit to place the issue of parole determination with a panel of experts, i.e., the Board, and not upon the sentencing judge, prison officials, and certainly not upon popular vote." Although public outcry may properly serve to trigger reconsideration of a parole-granting decision and an inquiry as to whether the decision was an abuse of discretion—as *Fain I* held—the board abdicates its statutory responsibilities when, absent any finding of abuse of discretion by the prior panel, it relies upon public outrage to rescind parole.

---

[5]As we noted in the statement of facts, this action resulted because "insufficient consideration was given to all factors and crimes" in the case.

### III. *Outcry as Evidence of Other Factors*

Our dissenting colleague suggests that the board found good cause for rescission as implicated and revealed by public outcry, rather than relying on the bare fact of, or yielding to, public pressure. He relies upon the statement which is contained in the board's conclusion that "[t]he public outcry in this case is sufficient to constitute good cause for rescission of the parole date because it indicates that if Fain were paroled at this time, he could not be safely assimilated into society and his personal safety may be endangered."

It is possible, as *Fain I* suggests, that public reaction may, depending upon its form and reliability, constitute some evidence of a factor relevant to the board's determination, such as the advisability of releasing the prisoner to a particular area. But, there is obviously grave danger as well as bitter irony in suggesting that a prisoner may be held indefinitely for his *own* protection, because of apparent opposition among portions of the public to his *ever* being released *anywhere*. The board's opinion, stated in conclusionary terms, suggests nothing more.

If the board is to rely upon public outcry as *evidence* of a factor relevant to the determination of cause, due process dictates that it make specific findings as to the nature of the evidence and its relevance. Otherwise, danger exists that the board will simply yield to public pressures, relying upon conclusionary formulae to rationalize the result and insulate it from judicial review. We have serious question from our examination of the record whether the form and substance of the public outcry in this case would constitute sufficient evidence of other relevant factors such as to justify rescission of Fain's parole, particularly in light of the prior rescission, and there are in any event no findings such as we consider to be required. The trial court was therefore correct in its conclusion that the board's action in rescinding Fain's parole date was unwarranted on this record.

We have decided, however, in deference to the board's authority, that the matter should be remanded to the board for further review and determination in light of our opinion. ▮▮ ▮▮▮▮ The trial court should retain jurisdiction over the matter, pending the board's action.[6]

---

[6]This disposition of the case makes it unnecessary to resolve Fain's contention that rescission of his parole amounts to an "ex post facto law" and is therefore unconstitutional for that reason.

Ex post facto laws are prohibited by both the federal and state Constitutions. (U.S. Const., art. I, § 9, cl. 3, art. I, § 10, cl. 1; Cal. Const., art. I, § 9.)

Mere rescission of Fain's parole based upon good cause would not amount to an ex post facto violation. The recent case of *In re Stanworth, supra,* 33 Cal.3d 176, however, makes it clear that if the board were permitted to rely upon newly established or implemented criteria, such as independent consideration of public outcry, in rescinding Fain's parole *this* would amount to an

**GRODIN, J.*—** I agree with Justice Miller's opinion except for the result. Neither in the trial court nor in its briefs on appeal did the board ask that the matter be remanded to it for further consideration in the event its reliance upon public outcry were rejected. On the contrary, the board has at all times been quite open in acknowledging that there had been no abuse of discretion or fundamental error in fixing Fain's parole date, and that it was relying upon public outcry alone. I therefore perceive inadequate justification for remanding the matter to the board. In my view the trial court's opinion was correct and ought to be affirmed.

Two votes are required for the disposition of a case, however, and were I to vote for affirmance there would exist an indeterminate standoff, thereby automatically requiring reassignment of the case to another court. Since I regard Justice Miller's disposition to be preferable both to that result and to the flat reversal advocated by our dissenting colleague, I reluctantly concur.

**ROUSE, Acting P. J.,** Concurring and Dissenting.—I concur with the majority's disposition of the res judicata issue, however, I cannot agree with their position on the question of public outcry.

---

ex post facto violation. Moreover, if Fain's parole were rescinded and a new parole date was considered based upon determinate sentencing law criteria rather than Indeterminate Sentencing Law criteria, this, too, would be an ex post facto violation.

In *Stanworth,* an inmate sentenced under the ISL in 1966 but considered for parole in 1979 under the DSL argued that the DSL's focus on the nature of his crime and its goal of uniformity of punishment among those committing similar crimes conflicted, to his prejudice, with the emphasis on individual rehabilitation of the former ISL. (*Id.,* at p. 179.)

The Supreme Court concluded that the change from ISL to DSL was more than procedural, thereby invoking ex post facto law principles, noting that the change in sentencing guidelines "followed and reflected the change in the underlying statutory scheme." (*Id.,* at pp. 181-182.)

The court noted that under the ISL parole release depended upon the individual characteristics of a particular inmate. (*Id.,* at p. 182.) Summarizing, the court remarked that the new rules generally reflect "an attempt to achieve uniformity and stress the criminal activities of the inmate rather than any social or personal factors." (*Id.,* at p. 186.)

"The critical issue before us," the Supreme Court declared, "thus becomes not whether a change in the actual date of release has been effected, but whether the standards by which defendant's date of release is to be determined have been altered to his detriment." (*Ibid.*)

The court concluded that the defendant's postconviction behavior "was treated under DSL very differently from the manner contemplated under the 1976 regulations. It appears that the 'standard of punishment' has substantially changed because postconviction behavior is no longer utilized in the same manner in determining his parole release date." (*Id.,* at p. 187.) "This alternation in the law may well be to defendant's disadvantage because his postconviction behavior has been given different weight in the fixing of his term." (*Ibid.*) Thus, "we conclude that the standard of punishment has been altered to defendant's prejudice in violation of ex post facto principles." (*Id.,* at p. 188.)

Defendant was thus held entitled to parole release consideration under both ISL and DSL standards. (*Ibid.*)

*Assigned by the Chairperson of the Judicial Council.

In my opinion, the Board of Prison Terms (board)[1] in this case found good cause to rescind Fain's parole date, consistent with the teaching of *In re Fain* (1976) 65 Cal.App.3d 376 [135 Cal.Rptr. 543] (*Fain I*).

The parties, the trial court and the majority of this court frame the principal issue as to whether public outcry alone is a sufficient ground for parole rescission. This characterization of the issue betrays a misunderstanding of the board's action and, worse, needlessly infuses this case with visions of vigilantism, public hysteria and abdication by the board of its responsibilities. When removed from such an emotional context, the question, more accurately stated, is twofold, i.e., whether or not the board's awareness of public outcry may give rise to good cause, sufficient upon which to base rescission of parole, and, if so, did the board in this case rescind Fain's parole based on such good cause? Based on a fair reading of *Fain I* and my review of the record, my answer to both parts of the question is yes.

The *Fain I* decision held that, pursuant to sections 3060 and 3063 of the Penal Code and California Administrative Code, title 15, section 2661 (now § 2451),[2] parole rescission may be based on any one of three specified grounds, namely, disciplinary conduct by the inmate, psychiatric deterioration of the inmate or any "new information which indicates that parole should not occur." (*Fain I, supra,* 65 Cal.App.3d at p. 392 & fns. 12 & 13.) The *Fain I* court held that public outrage at the prospect of a particular individual's release from prison constituted " 'new information which indicates that parole should not occur' and which required the authority's consideration of that possibility . . . ." (*Id.,* at pp. 392-393.) While that court expressly refrained from holding that the Adult Authority's awareness of such outrage would, in itself, "command" parole rescission (*id.,* at p. 393), it clearly indicated that such awareness was " 'new information which indicates'—or not, depending upon the result to be reached in the rescission proceedings . . .—that [Fain's] 'parole should not occur' because it reaches such pertinent questions as whether he may be assimilated into society, and indeed whether he will be personally safe, outside of prison" (*id.,* at p. 393, fn. 14). The court then went on to state that, upon remand to the Adult Authority, said body would be entitled to exercise its " 'great,' 'absolute,' and 'almost unlimited,' "discretion to decide whether Fain's parole was " 'improvidently granted.' " (*Id.,* at p. 394.)

Such analysis compels the conclusion that, far from enunciating any inflexible rule limiting the Adult Authority's consideration of public outrage, the *Fain I* court took great pains to infringe as little as possible upon the Adult

---

[1]The Board of Prison Terms is the successor to the Adult Authority.

[2]Hereafter pertinent sections of the California Administrative Code, title 15, shall be referred to as Parole Board Rules.

Authority's extremely broad discretion in matters entrusted to it by statute. Stated differently, the *Fain I* court held only that the Adult Authority *could* rely upon public outrage as a basis for parole rescission in any instance where the Adult Authority determined that there was public reaction of such a nature as to indicate that a particular inmate, if paroled, could not be assimilated into society or might be threatened with physical violence.

The *Fain I* court wisely declined to encroach upon the Adult Authority's broad discretion within its area of expertise, preferring, instead, to adopt a more flexible rule which would allow its members to determine, on a case-by-case basis, whether public outrage should or should not warrant a parole rescission. At the same time, the court accorded full respect and protection to the due process rights of the potential parolee by pointing out that under no circumstances could mere whim, caprice or rumor constitute the basis for parole rescission and that the inmate always has the right to know the precise reason for the parole rescission. (*Fain I, supra,* at p. 394.) Thus, the parole authority must specify exactly why it has determined that the public outrage in any particular case justifies parole rescission. Such a requirement facilitates informed review of a decision to rescind parole and effectively precludes the possibility that such a decision could be based upon improper factors such as those to which the majority alludes, namely, race, creed, ethnic background, labor activities or political views.

Here, the record shows that the board exercised its discretion consistently with the teaching of *Fain I,* finding and relying upon good cause for rescission as implicated and revealed by public outcry, rather than relying on the bare fact of, or yielding to, public pressure. The board's conclusion states, in part, "The public outcry in this case is sufficient to constitute good cause for rescission of the parole date *because it indicates that if Fain were paroled at this time, he could not be safely assimilated into society and his personal safety may be endangered. A release at this time would not be in the best interests or protect the safety of Fain or the public.*" (Italics added.) That the board did not simply rely on the petition is further evident in its finding that the signatures "are evidence of extraordinary public outcry [which] *in conjunction with the other evidence* is sufficient to constitute good cause to rescind Fain's parole date." (Italics added.)

Although there is no issue of sufficiency of the evidence before us, it bears noting that some of this "other evidence" presumably relied on by the board appears in the record. For example, in its reasons for disposition, the board specifically mentions relying on "opposition to Fain's release expressed at [the] hearing on October 22 and 23, 1981 by the Senate Subcommittee on the Board of Prison Terms." The hearing transcript shows that Chairman Brown and Executive Officer Dezember of the board were present to receive testimonial

evidence. They heard from a Ms. Goehring, who pointed out that Fain was set to be released into the same city where one of his rape victims presently resides, and from Mrs. Ulrich, mother of Fain's shotgun-murder victim, who joined in Ms. Goehring's comments. They heard from Oakdale Police Chief David Sundy, a 22-year veteran police officer, who expressed doubts that the public safety and welfare would be properly served by releasing any parolee into the same area where his victims live or his crimes were committed.[3] Assemblyman Thurman voiced concern that releasing a parolee into an area where he would not be "accepted back into society" would increase the parolee's chances of recidivism and lessen his chances for successful rehabilitation. Such testimony is more than mere hysteria or public outrage or indignation; it specifically supports the board's expressed concern for the safety and best interests of Fain and the public, as well as the unlikelihood of Fain's safe assimilation into society at the time and in the geographic area proposed. We must also bear in mind that the hearing testimony thus described was but a small part of the total input available for the board's consideration.

I make one further observation regarding the effect of public outcry in this case. Although the record shows that the board did not base its decision on public opposition per se (thus making it unnecessary to determine whether such a basis for action might be proper), I believe that the mere fact of public opposition has *some* place in the board's discretionary decision.

The majority finds nothing in the applicable case law to suggest that public outcry may be considered as grounds for parole rescission. To the contrary, I find room for at least some consideration of public opposition in our Supreme Court's mandate that " 'the interests of public security' " (*In re Schoengarth* (1967) 66 Cal.2d 295, 300 [57 Cal.Rptr. 600, 425 P.2d 200], quoting from *People* v. *Denne* (1956) 141 Cal.App.2d 499, 507 [297 P.2d 451]) and *"all* relevant factors" (*In re Minnis* (1972) 7 Cal.3d 639, 645 [102 Cal.Rptr. 749, 498 P.2d 997]; also cited in *In re Dunham* (1976) 16 Cal.3d 63, 66 [127 Cal.Rptr. 343, 545 P.2d 255) be considered in the exercise of the board's discretion.

---

[3]One might well understand the concerns of these witnesses as well as that of the parole board when Mr. Fain's criminal activities are recalled: On June 19, 1967, he caused the car driven by young Mark Ulrich, an Oakdale High School student, to stop, killed Mark with a shotgun blast fired at short range, ordered the two young high school girl passengers out of Mark's car and into his car, drove them to a remote field where, at gun point, he forced them to disrobe and then committed various sexual acts upon their persons. For these crimes he was convicted of first degree murder, forcible rape, forcible sex perversion and kidnaping. He was also convicted of raping a Mrs. Hayes and of attempting to kidnap a Mrs. Workman. His death sentence was later reduced to life imprisonment. (*People* v. *Fain* (1969) 70 Cal.2d 588 [75 Cal.Rptr. 633, 451 P.2d 65].) Thereafter, in the company of fellow inmates who overpowered their guards, he escaped from the Stanislaus County jail, was recaptured and subsequently convicted of the crimes of escape, kidnaping and armed robbery. (*People* v. *Fain* (1971) 18 Cal.App.3d 137 [95 Cal.Rptr. 562].)

The majority also finds nothing in the applicable statutes to suggest "that public outcry, per se, may be considered as a basis for rescission of parole." Yet the very statutes they examine clearly mandate that public input be considered. Section 2028 of the Parole Board Rules states that comments from the public "*shall* be incorporated into the hearing record *and considered* before the decision is final." (Italics added.) Section 3046 of the Penal Code requires the board to consider recommendations of persons "interested in the granting or denying of such parole." Finally, the Victim's Bill of Rights requires that the board "*shall consider* the statements of victims and next of kin" in deciding whether to release the person on parole. (Pen. Code, § 3043; italics added.) If the public input authorized by those provisions may trigger *reconsideration* of an already set parole date but cannot, as the majority maintains, in any way constitute *cause* for rescission, then I respectfully submit that to receive public input at all is an idle act—a meatless bone tossed to the public. I am sure that a murder victim's next of kin exercising their rights under the Victim's Bill of Rights, for example, would be appalled to learn that, while the board must listen to their comments, it is legally forbidden to let those comments affect its decision. I suspect that the Legislature would be equally appalled, for it seems to me that the majority is essentially nullifying the statutory mandate that the board *consider* public input in its decisions.

Putting aside the question whether public opposition, per se, has any place in determining cause for parole rescission, my disagreement with the majority in this case is over their evident skepticism as to whether the board in fact relied on anything *but* public opposition, per se. I do not share their skepticism; but, even if I did, I would be constrained to limit my inquiry to the board's stated reasons and conclusion, and (if substantiality of the evidence were an issue), whether or not the evidence in the record sustained their position.

In this instance, I fear that the trial court and the majority have overlooked the doctrine of separation of powers, which precludes judicial inquiry into the motivation or mental processes of the board and speculation as to what might have been in the minds of the individual board members, except as might be shown by the official action taken. The court in *Fain I* specifically confronted Fain's claim that the Adult Authority considered rescinding his parole because its chairman had "improperly yielded to public and political pressure," concluding, "The contention is to be rejected, as a matter of law, because the constitutional doctrine of separation of powers precludes judicial inquiry into the 'motivation or mental processes' which may underlie action by a nonjudicial agency of government. [Citations.]" (*Fain I, supra,* 65 Cal.App.3d at p. 393, fn. 14; see also *City and County of San Francisco* v. *Cooper* (1975) 13 Cal.3d 898, 911-916 [120 Cal.Rptr. 707, 534 P.2d 403] (refusing to examine whether school board's enactment of ordinance and resolution was in response to coer-

cive influence of "illegal" public employee strike); *County of Los Angeles* v. *Superior Court (Burroughs)* (1975) 13 Cal.3d 721, 726-732 & fn. 5 [119 Cal.Rptr. 631, 532 P.2d 495] (holding that lower court improperly ordered discovery of board of supervisors members' conversations regarding reasons for voting for challenged ordinance); *City of Fairfield* v. *Superior Court* (1975) 14 Cal.3d 768, 772-773 & fn. 1, 776-777 [122 Cal.Rptr. 543, 537 P.2d 375] (concluding that discovery of reasoning processes of city council members acting in quasi-judicial capacity in rejecting application for planned unit development permit was improper).) Here, the official action taken, as evidenced by the board's reasons and conclusions, shows due regard for good cause criteria apart from whatever influence the mere fact of public opposition may have had on the decision. Those who question the integrity of decisions made by the board or any other administrative body must seek reform through legislation directed at changing procedural safeguards rather than engage in the business of second-guessing the decisions of administrative bodies.[4]

---

[4] I have no quarrel with the holding or rationale of *Sellars* v. *Procunier* (9th Cir. 1981) 641 F.2d 1295, cited by the majority. There, in holding that state parole board officials were entitled to absolute immunity from civil rights actions (brought under 42 U.S.C. § 1983) by prisoners in connection with parole decisions, the court reasoned, "Just as the decision-making process of judges must be kept free from fear, so must that of parole board officials. Without this protection, there is the same danger that the decision-maker might not impartially adjudicate the often difficult cases that come before them." (*Id.*, at p. 1303.) Fear of personal liability and inconvenience from litigation, however, is markedly different from the more remote public pressure at work here, which does not directly threaten a parole board official's pocketbook. Also, a parole board official is not elected or appointed to his or her position by the public, so there is no immediate fear of public reprisal.

*Winsett* v. *McGinnes* (3d Cir. 1980) 617 F.2d 996, a case heavily relied on by the majority, is distinguishable. In *Winsett,* Delaware prison officials denied work release status to a prisoner whose crime of murder had aroused "a pervasive public outrage throughout the state" (p. 999) and whose imminent work release was met with "increasingly evident" public opposition manifested, in part, by a letter from a state senator demanding reconsideration and retraction of steps already taken toward release (p. 1000). A prison official who subsequently vetoed one of the prisoner's applications admitted at trial that the prisoner would have gone on work release but for "intense legislative pressure." (P. 1002.) In sustaining the prisoner's procedural due process challenge to denial of his work release applications, the *Winsett* majority determined that the board's "lurking fear" of unfavorable public reaction and legislative reprisal had "no place . . . in the exercise of discretion whether to grant or deny a prisoner work release under the regulatory provisions" governing the program. (*Id.*, at p. 1007.)

Although *Winsett* and the instant case are factually similar in many ways, the board in *Winsett* did not ground its decision on assimilation, safety or other considerations which were relevant to the prisoner's release. Indeed, the court noted that the board would have been justified in relying on certain "relevant considerations—among which [were] . . . included the prognosis for the inmate's behavioral adjustment, the risk of flight, and the inmate's personal safety," even though those considerations were not specified in the regulations. (617 F.2d at p. 1007.) Thus, what the majority in *Winsett* objected to was the board's sole reliance on the mere fact of public and legislative outrage, a situation different from the case before us.

Moreover, the dissent in *Winsett* convincingly argued that public opinion did have a place in the bounds of the board's discretion since Delaware legislation requires the board to consider detriment to the community or the inmate and (as in California) information from the public, including testimony of the immediate family of the victim. (*Id.*, at pp. 1014-1015 (dis. opn. Weis, J.).)

The trial court disagreed with the board's view that public outrage which surfaced just prior to the February 1982 decision to rescind the parole date is "new information" for purposes of Parole Board Rule 2451, subdivision (c). The court reasoned that the recent petition cannot be considered new because a similar petition containing 18,000 signatures was brought to the attention of the board five years ago, apparently taking the view that public outrage, once voiced, is old news forever after, regardless of its changing intensity. Or, to put it another way, the public has only one opportunity in the entire parole process to impact on the board's decision. This reasoning is fundamentally flawed in two ways.

First, as the court in *Fain I* made clear, the board's awareness of public hostility toward release of an inmate has significance "because it reaches such pertinent questions as whether he may be assimilated into society and . . . whether he will be personally safe, outside of prison." (*Fain I, supra,* 65 Cal. App.3d at p. 393, fn. 14.) As the parole release date draws near, the need to reassess the chances of successful assimilation and the prospect of safe release becomes critical, and such a reassessment, if undertaken, cannot meaningfully be made on the basis of information gathered years before. Increased opposition to release, especially from the geographic area into which release is planned, could be of paramount importance to a reconsideration. Similarly, public support for, or decreased opposition to, such releases could be important. It would be unrealistic to expect that public interest is frozen in intensity for all time as of the date when it is first voiced and considered. I believe that any significant increase or decrease in public interest should be accorded consideration by the board as new information which is relevant to the decision whether to let a scheduled parole release date stand.

Second, a mere change in the number of signatures tells little about the assimilation and safety factors just discussed. Meaningful inquiry requires looking at the geographic location of those who signed the petition. Moreover, limiting the inquiry into the number of signatures, even from the area of proposed release, focuses too much on quantity and ignores the quality of information brought to light in the course of public outcry. In this case, for example, information came to the board from the public in the form of correspondence and oral testimony, not just from the petition itself. The importance of this kind of information, much of which can be characterized as part of the public outcry, is neither made greater nor diminished by the length of any petition.

For the foregoing reasons, I must conclude that the board properly considered the evidence of renewed public outrage as new information and, consis-

tent with *Fain I,* found good cause in that information to rescind Fain's parole release date.[5]

I would reverse the trial court's order and discharge the writ.

A petition for a rehearing was denied February 14, 1983, and appellant's petition for a hearing by the Supreme Court was denied March 23, 1983. Grodin, J., did not participate therein. Richardson, J., was of the opinion that the petition should be granted.

---

[5]Like the majority, I find it unnecessary to reach Fain's ex post facto contention. Fain urges that application of the board's "newly developed 'public outcry doctrine' " to his case runs afoul of the prohibition against ex post facto laws. For reasons set forth above, however, I have concluded that the board rescinded Fain's parole based upon good cause rather than public outcry per se, and I concur in the majority's observation that, notwithstanding the very recent case of *In re Stanworth, supra,* 33 Cal.3d 176, mere rescission of parole based upon good cause does not amount to an ex post facto violation. (See maj. opn., *ante,* at pp. 311-312, fn. 6.)