[No. AO22049. First Dist., Div. Two. July 28, 1983.]

In re WILLIAM ARCHIE FAIN on Habeas Corpus.

542

COUNSEL

Robert Y. Bell for Petitioner.

Quin Denvir, State Public Defender, Michael R. Snedeker, Deputy State Public Defender, and Rowan K. Klein as Amici Curiae on behalf of Petitioner.

John K. Van de Kamp, Attorney General, Roger E. Venturi and Anthony L. Dicce, Deputy Attorneys General, for Respondent.

Robert H. Philibosian, District Attorney (Los Angeles), Harry B. Sondheim and Richard W. Gerry, Deputy District Attorneys, as Amici Curiae on behalf of Respondent.

## OPINION

**KLINE, P. J.**—This habeas corpus proceeding presents the novel question whether the Governor may suspend the parole release date previously accorded a state prison inmate by the Board of Prison Terms and conduct a hearing to determine whether to rescind said release date. We determine the Governor may not do so; for the clear meaning of the pertinent statutes as well as the legislative history of the specific provision the Governor expressly relies upon compel the conclusion that there is no gubernatorial authority to rescind the parole release date of a prisoner still in physical custody.

### I.

Petitioner William Archie Fain was in 1967 convicted of murder, rape, sex perversion, kidnaping and attempted kidnaping. In 1969 he was additionally convicted of escape, robbery and kidnaping.[1] Fain has served more than 15 years of a life term in state prison for the aforesaid crimes. The details of his violent history and numerous encounters with the criminal justice system have been amply memorialized and need not be reiterated. (See *People* v. *Fain* (1969) 70 Cal.2d 588 [75 Cal.Rptr. 633, 451 P.2d 65]; *Fain* v. *Superior Court* (1970) 2 Cal.3d 46 [84 Cal.Rptr. 135, 465 P.2d 23]; *People* v. *Fain, supra,* 18 Cal.App.3d 137; *In re Fain* (1976) 65 Cal.App.3d 376 [135 Cal.Rptr. 543]; and *In re Fain* (1983) 139 Cal.App.3d 295 [188 Cal.Rptr. 653].)

The facts pertinent to the instant case are as follows: In April 1977, after the decision in *In re Fain, supra,* 65 Cal.App.3d 376, the Board of Prison Terms (Board) withdrew the parole release date it earlier granted Fain and set a new parole date of April 26, 1983. On February 25, 1982, relying solely upon public outcry, the Board rescinded the April 26, 1983, parole date. Fain then sought a writ of habeas corpus from the Marin County Superior Court, which granted the writ and ordered his immediate release.

---

[1]The second kidnaping conviction was reversed. (*People* v. *Fain* (1971) 18 Cal.App.3d 137, 144 [95 Cal.Rptr. 562].)

On appeal from the granting of the writ, we held that the rescission of a previously established parole date could not be based solely upon a finding of public outcry and remanded the case to the Board for further review. (*In re Fain, supra,* 139 Cal.App.3d 295.) On February 14, 1983, the Board found that apart from public outcry, there was no new information warranting rescission of the April 26, 1983, release date. On March 23, 1983, the California Supreme Court denied the Board's petition for hearing. Finally, on April 5, 1983, 21 days prior to Fain's scheduled release, the Governor issued an executive order, the full text of which is set forth in the margin below,[2] suspending Fain's release date and ordering the Board to retain him in custody pending a parole rescission hearing before the Governor's representative and a gubernatorial decision as to Fain's "suitability for parole." Fain, alleging among other things that the Governor acted in excess of his authority, thereupon filed the instant petition for writ of habeas corpus.

## II.

■ Though the power here challenged has apparently never before been asserted by any California Governor, and there is therefore no case directly on point, it is clear that ". . . it is within the province of the courts to review on *habeas corpus* an executive order made in a proceeding such as this involving personal restraint, for the purpose of ascertaining whether or not the order is jurisdictionally supported." (*In re Knaesche* (1937) 22 Cal.App.2d 667, 672 [72 P.2d 216].)[3]

---

[2]Executive Order D-8-83 provides as follows:

"Whereas, William Archie Fain was convicted of first degree murder, kidnapping, rape and sex perversion for crimes committed between June 9, 1967, and June 19, 1967; and

"Whereas, William Archie Fain was armed with or used a deadly weapon during the commission of these offenses; and

"Whereas, William Archie Fain was sentenced to death by a jury of his peers, but that sentence was reversed on appeal and a life sentence imposed; and

"Whereas, widespread public opposition to William Archie Fain's parole, based upon the concern that he poses a threat to public safety and cannot be safely assimilated into society, raised a question of William Archie Fain's suitability for parole; and

"Whereas, allegations of William Archie Fain's dishonesty, manipulative personality and apparent lack of remorse for his crimes raise questions concerning William Archie Fain's suitability for parole; and

"Whereas, the parole release date presently accorded William Archie Fain may have been improvidently granted;

"Now, Therefore, I, George Deukmejian, Governor of the State of California, pursuant to the authority vested in me by Article V, Section 8, of the California Constitution and Penal Code section 3062, and by reason of the above-stated factors, it is ordered that the parole release date be suspended and that the Board of Prison Terms retain William Archie Fain in custody until a parole rescission hearing can be held by my representative and a decision reached by me as to William Archie Fain's suitability for parole."

[3]*Knaesche,* which involved the revocation of parole rather than the rescission of a parole release date, is the only reported case in which a California Governor has ever before sought to exercise any authority pursuant to Penal Code section 3062 and the predecessor statutes.

The Governor finds the authority to support his exercise of power in Penal Code section 3062, which provides in its entirety as follows: "The Governor of the state shall have *like power* to revoke the parole of any prisoner. The written authority of the Governor shall *likewise* be sufficient to authorize any peace officer to retake and return said prisoner to the state prison. His written order revoking the parole shall have the same force and effect and be executed in *like manner* as the order of the Board of Prison Terms." (Italics added.) The Governor asserts, and we agree, that the terms "like power," "likewise" and "like manner" refer to the two immediately preceding statutes, sections 3060 and 3061, which were contemporaneously enacted and also refer to the revocation of parole.

Section 3060 provides: "The Board of Prison Terms shall have full power to suspend or revoke any parole, and to order returned to prison any prisoner upon parole. The written order of any member of the Board of Prison Terms shall be a sufficient warrant for any peace or prison officer to return to actual custody any conditionally released or paroled prisoner."

Section 3061 provides: "It is hereby made the duty of all peace officers to execute any such order in like manner as ordinary criminal process."

The Governor concedes, as he must, the distinction between the revocation of parole, which refers to the situation in which an inmate has previously been released from prison, and the rescission of an unexecuted grant of parole, i.e., the withdrawal of a release date prior to the commencement of parole. (See *In re Prewitt* (1972) 8 Cal.3d 470, 474 [105 Cal.Rptr. 318, 503 P.2d 1326], and *In re Fain, supra,* 65 Cal.App.3d at p. 391.) The Governor claims, however, that the power to rescind a parole release date is necessarily included in the power to "suspend or revoke" parole.

This contention rests upon the premise that the Board's power to rescind is inherent in its power to revoke pursuant to section 3060. Stated differently, the Governor asserts that the power of the Board to revoke parole, and therefore also its inherent power to rescind a parole release date, arise out of section 3060. Since his "like power" is identical to that granted the Board under section 3060, the Governor concludes that he too has the power to rescind. The error in this argument lies in the failure of its major premise to recognize the different statutory sources of the Board's distinct powers to rescind a parole release date and to revoke parole.

Analysis of the parole provisions of the Penal Code demonstrates that the Board's power to rescind derives not from section 3060 but from section 3040.

Section 3040 grants the Board "the power to allow prisoners imprisoned in the state prisons . . . to go upon parole outside the prison walls and enclosures." The next following sections define the manner in which that power is to be exercised. For example, section 3041 prescribes the criteria for setting parole release dates and reviewing the suitability for parole of eligible prisoners. Section 3041.5 defines the rights of prisoners and the duties of the Board "[a]t all hearings for the purpose of . . . postponing or rescinding of parole dates." And section 3041.7 provides that "[a]t any hearing for the purpose of . . . postponing, or rescinding a parole release date of a prisoner under a life sentence, such prisoner shall be entitled to be represented by counsel . . ." in addition to the rights provided by section 3041.5. Significantly, sections 3041.5 and 3041.7 are the *only* provisions of the Penal Code that specifically refer to the rescission of a parole release date. The fact that these two provisions of the Penal Code closely follow section 3040, which they clarify, clearly manifests legislative understanding that the power to rescind a parole release date is an aspect of the power to grant such a date pursuant to section 3040.[4]

Sections 3041.5 and 3041.7 were enacted at a time when significant revisions in the Penal Code were being made in connection with the determinate sentence law, which became effective on July 1, 1977. As required by well-established rules of statutory construction (see *People* v. *Tanner* (1979) 24 Cal.3d 514, 533 [156 Cal.Rptr. 450, 596 P.2d 328]; *Buckley* v. *Chadwick* (1955) 45 Cal.2d 183, 200 [288 P.2d 12, 289 P.2d 242], and *Kusior* v. *Silver* (1960) 54 Cal.2d 603, 618 [7 Cal.Rptr. 129, 354 P.2d 657]), we must presume that in enacting these and related parole provisions the Legislature was aware of existing judicial decisions that not only made a distinction between the rescission of a parole release date and the revocation of parole (see, e.g., *In re Prewitt, supra,* 8 Cal.3d 470, and *Gee* v.

---

[4]We agree with our dissenting colleague that sections 3041.5 and 3041.7 do not create the power to rescind. As the dissent points out, these two sections simply acknowledge the existence of such power and prescribe the procedure for its exercise. Our point, however, is that by positioning these two Penal Code provisions immediately after sections 3040 and 3041, which latter section also refers to the setting of release dates by the Board, the Legislature demonstrated its comprehension that the power to rescind arises out of section 3040. Stated differently, sections 3040, 3041, 3041.5 and 3041.7 each define phases of a single coherent procedure. Section 3040 creates the power to grant and, derivatively, the powers to deny or rescind a parole release date; section 3041 establishes the times within which such powers may be exercised and the mode of their exercise; and sections 3041.5 and 3041.7 prescribe the rights of prisoners at hearings concerning the granting, denial or rescission of a release date. Given the obvious interrelationship of these various sections, and the absence therein of any reference whatsoever to the power to revoke parole created in sections 3060 and 3062, we perceive no rational basis for the unexplained "opinion," announced in dissent, that the source of the power to rescind a release date arises from the power to revoke parole.

*Brown* (1975) 14 Cal.3d 571 [122 Cal.Rptr. 231, 536 P.2d 1017]),[5] but which also declared that the Governor had no discretion to grant or withhold a parole release date. (*Azeria* v. *California Adult Authority* (1961) 193 Cal.App.2d 1, 5 [13 Cal.Rptr. 839].) The failure of the Legislature at that time (or at any other time) to specifically authorize the Governor to withhold or rescind a parole date therefore must be deemed to represent a considered "intention to leave the law unchanged in that respect." (*Kusior* v. *Silver, supra,* 54 Cal.2d at p. 618.)

In short, the statutory scheme demonstrates that the power to rescind a parole release date is an element of the power to grant or deny parole in the first instance, not an aspect of the power to revoke after parole has actually commenced.[6] Nowhere in the statutes is there any provision for the Governor to share the Board's power to grant or withhold parole in the same manner he shares the power to revoke. It would therefore seem to follow that if there is no statutory authority for the Governor to grant or withhold a parole release date, neither is there any such inherent authority for him to rescind such a date.

This conclusion is not altered by article V, section 8, of the California Constitution, which the Governor relies upon simply to buttress his expansive interpretation of section 3062. Article V, section 8, provides that ". . . the Governor, on conditions the Governor deems proper, may grant a reprieve, pardon, and commutation, after sentence, except in case of impeachment." It is urged by the Governor that the power to pardon is similiar to the power to parole (citing *In re Peterson* (1939) 14 Cal.2d 82, 85 [84 Cal.Rptr. 694])[7] and that since his authority to revoke a conditional pardon has been judicially recognized (*In re Marks* (1883) 64 Cal. 29 [28 P. 109]; *In re Wilson* (1916) 29 Cal.App. 702 [157 P. 529]), so too should the court acknowledge the Governor's power not only to revoke parole but, as stated in the Governor's brief, "to *prevent* a parole which is improvidently grant-

---

[5]The one similarity the Supreme Court acknowledged in *Prewitt* and *Gee* was that rescission and revocation both may involve a deprivation of conditional liberty and therefore an inmate is entitled to the same procedural due process protections in each case.

[6]See *In re Fain, supra,* 65 Cal.App.3d at pages 390-392 where we indicated that the power of the Board to rescind a parole date is an aspect of the agency's inherent power to reconsider the granting of a parole date pursuant to section 3040.

[7]*Peterson* was a rather extraordinary case in which the petitioner, an inmate at San Quentin about to be paroled to the custody of the State of Texas, from whose prison he earlier escaped, demanded the right to reject the parole granted him by the California authorities, arguing that parole can only be effective when its conditions are accepted and that it cannot be forced upon him without his consent. In sustaining the petitioner's argument, the Supreme Court accepted his analogy to the rule that to be effectual, a conditional pardon must be accepted by the prisoner. (Citing *In re Marks* (1883) 64 Cal. 29 [28 P. 109].) In so doing, the court noted: "In its essential characteristics . . . a parole cannot be distinguished from a conditional pardon. Each constitutes the release of a convict upon fixed conditions before the expiration of his term of imprisonment and many courts have drawn upon this analogy

ed." (Italics added.) This attempt to translate the power to pardon, and the attendant authority to revoke a conditional pardon, into the power to rescind a parole date is simply untenable.

■ Although they may be similar in certain very limited respects—such as, for example, that both may effectuate release from in-prison custody—a pardon is nonetheless fundamentally distinct from parole, as are the powers to pardon and parole. For example, the granting of a pardon, which is not restricted to prison inmates, generally operates to restore to a convicted person "all the rights, privileges, and franchises of which he has been deprived in consequence of said conviction or by reason of any matter involved therein." (Pen. Code, § 4853.) The granting of parole, on the other hand, only applies to prison inmates and does not restore any civil rights. A prisoner on parole remains constructively a prisoner under sentence and in legal custody under the control of prison authorities. (*In re Marzec* (1945) 25 Cal.2d 794 [154 P.2d 873]; *People* v. *Denne* (1956) 141 Cal.App.2d 499 [297 P.2d 451].) As stated in *Morrissey* v. *Brewer* (1972) 408 U.S. 471, 477 [33 L.Ed.2d 484, 496, 92 S.Ct. 2593], "[r]ather than being an *ad hoc* exercise of clemency, parole is an established variation on imprisonment of convicted criminals." The power to grant a pardon is constitutionally and by statute (Pen. Code, § 4800) within the exclusive jurisdiction of the Governor. The power to grant or deny parole, which is not a constitutional power, is by statute (Pen. Code, §§ 3040, 5077) committed entirely to the judgment and discretion of the Board. (*People* v. *Superior Court (Syvinski)* (1970) 2 Cal.3d 527, 533 [86 Cal.Rptr. 83, 468 P.2d 211], quoting *In re Schoengarth* (1967) 66 Cal.2d 295, 300 [57 Cal.Rptr. 600, 425 P.2d 200].) As this court stated in *Azeria* v. *California Adult Authority, supra,* 193 Cal.App.2d 1, "[t]he Governor, not the [Board], has discretion as to granting a pardon. On the other hand, the [Board] not the Governor, has discretion in fixing petitioner's term and granting or withholding parole." (*Id.,* at p. 5.) Furthermore, the statutory and regulatory procedures for obtaining a parole date (Pen. Code, § 3040 et seq. and tit. 15, Cal. Admin. Code, §§ 2230-2411) are also very distinct from those separately set forth for obtaining a gubernatorial pardon. (Pen. Code, § 4852.01 et seq. and tit. 15, Cal. Admin. Code, §§ 2815-2819.)

■ These fundamental differences between pardon and parole and, more significantly, the statutory, regulatory[8] and case law distinction be-

to hold that a proffered parole must likewise be accepted to be effective. [Citations.]" (14 Cal.2d at p. 85.) The analogy between the terms of parole and the conditions of a conditional pardon, to the extent that parole or conditional pardon are only effectuated when such terms or conditions are accepted, does not relate at all to the question of who possesses the distinct powers to parole and to conditionally pardon; nor does the analogy discussed in *Peterson* logically justify an inference that the power to pardon conditionally ipso facto includes powers related to parole, or the converse.

[8]Compare title 15, California Administrative Code, sections 2230-2411 (Parole Release)

tween the revocation of parole and the rescission of a parole release date, very clearly establish that the sole power relative to parole that the Governor shares with the board is the power to revoke the parole of a prisoner no longer in physical custody.[9]

Moreover, long established rules of statutory construction would compel us to reject the Governor's interpretation of Penal Code section 3062 even if, arguendo, we were able to discern some material ambiguity in that statute and the related parole provisions. ■ "While it is true, the rule of the common law that penal statutes are to be strictly construed has been abrogated by the code [Pen. Code, § 4], which provides that 'all its provisions are to be construed according to the fair import of their terms, with a view to effect its object [*sic*] and promote justice,' it is also true that the defendant is entitled to the benefit of every reasonable doubt, whether it arise out of a question of fact, or as to the true interpretation of words or the construction of language used in a statute, . . ." (*Ex parte Rosenheim* (1890) 83 Cal. 388, 391 [23 P. 372], quoted with approval in *People* v. *Ralph* (1944) 24 Cal.2d 575, 581 [150 P.2d 401]; *People* v. *Valentine* (1946) 28 Cal.2d 121, 143 [169 P.2d 1]; *People* v. *Smith* (1955) 44 Cal.2d 77, 79 [279 P.2d 33]; and *Walsh* v. *Dept. of Alcoholic Bev. Control* (1963) 59 Cal.2d 757, 764-765 [31 Cal.Rptr. 297, 382 P.2d 337]; see also *Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 631 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].) As recently reiterated by our Supreme Court, " ' "[w]hen language which is reasonably susceptible of two constructions is used in a penal law, ordinarily that construction which is more favorable to the offender will be adopted." ' " (*In re Jeanice D.* (1980) 28 Cal.3d 210, 217 [168 Cal.Rptr. 455, 617 P.2d 1087], quoting *People* v. *Smith, supra,* which

---

and title 15, California Administrative Code, sections 2450-2485 (Postponement or Rescission of Release).

[9]Referring to our acknowledgment of this gubernatorial power, the dissent herein concludes that "it seems pointless to hold that the Governor must wait for the parolee's first step outside the confines of prison before taking action based upon information leading him to believe that the prisoner is not a suitable subject for parole." (Dis. opn., at p. 559.) We think it hardly "pointless." First, there is nothing in the record before us to warrant speculation that the Governor has determined to exercise his revocation power with respect to petitioner and we think it wiser to confine this decision to the facts presented. Furthermore, the quoted statement necessarily implies, without discussion, that the cause essential to revoke parole (Pen. Code, § 3063) may consist entirely of facts known prior to release. This is in our view a very doubtful proposition. Without deciding the issue, for it is not now before us, we only point out that it may sensibly be contended that the facts needed to justify the revocation of parole must occur after the first step outside prison or consist of information not available to and considered by the Board prior to the parolee's release. Since, as we hold, the Governor is not authorized to prevent parole by denying or rescinding a release date, which powers are conferred exclusively on the Board by section 3040, it would seem to follow that the Governor should not be permitted to indirectly exercise and effectively usurp such power by "revoking" parole the moment an inmate steps outside the prison walls.

in turn quotes from *People* v. *Ralph, supra.*) These rules apply to the present action even though it involves an administrative proceeding rather than a criminal prosecution. (*Walsh* v. *Dept. of Alcoholic Bev. Control, supra,* 59 Cal.2d at p. 765.)

 Additionally, under the familiar maxim of *expressio unius est exclusio alterius,* i.e., that the expression of certain things in a statute necessarily involves exclusion of other things not expressed, which also applies only in the event of statutory ambiguity or uncertainty (*Williams* v. *Los Angeles Metropolitan Transit Authority* (1968) 68 Cal.2d 599, 603 [68 Cal.Rptr. 297, 440 P.2d 497]), the enumeration of powers as being within the authority of a statute preclude the inclusion by implication in the powers conferred of other powers. Thus, as has been stated, " ' " "In the grants [of powers] and in the regulation of the mode of exercise, there is an implied negative; an implication that no other than the expressly granted power passes by the grant; that it is to be exercised only in the prescribed mode . . . ." ' " (*Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 196 [132 Cal.Rptr. 377, 553 P.2d 537] quoting *Martello* v. *Superior Court* (1927) 202 Cal. 400, 405 [261 P. 476]; see also 58 Cal.Jur.3d, Statutes § 115, pp. 503-504, and 2A Sutherland, Statutory Construction (4th ed. 1972) § 47.23.) The force of the maxim is strengthened where, as here, the power omitted in the statute in question is provided in another statute. Accordingly, the enumeration in Penal Code sections 3060 and 3062 of only the "power to suspend or revoke any parole" and the "like power to revoke . . . parole," as well as the enumeration in *other* Penal Code provisions of the power to grant or withhold a parole release date (§ 3040) and prescription of the manner in which the power to rescind shall be exercised (§§ 3041, 3041.5, 3041.7), render it improper to presume that the powers to revoke conferred in sections 3060 and 3062 include by implication the power to rescind a release date.

Viewed in the light of the foregoing principles, the statutory scheme provides no room for conjecture that the power to revoke parole includes, sub silentio, the power to grant or rescind a parole release date, even indulging the contention that the statutes are ambiguous on the issue.

The cases relied upon by the Governor in support of the proposition that the power to rescind a parole release date is inherent in the power to revoke parole (*Vogulkin* v. *State Board of Education* (1961) 194 Cal.App.2d 424 [15 Cal.Rptr. 335]; *In re Clutchette* (1974) 39 Cal.App.3d 561 [114 Cal.Rptr. 509]; and *In re Fain, supra,* 65 Cal.App.3d 376) are all manifestly inapposite.

*Vogulkin* was an action seeking to enjoin enforcement of certain sections of the Education Code, and for an order directing the State Board of Education to conduct a hearing to determine the plaintiff's fitness to teach in

the public schools. On the basis of then Education Code section 13205 (which in 1977 was replaced by Ed. Code, §§ 44423 and 87333) the court held that when the plaintiff schoolteacher voluntarily requested the state board to revoke his teaching credential the school board was mandatorily required by the statute to revoke the credential, as it did. (*Id.*, at p. 427.) In the course of concluding that after this revocation the plaintiff retained no vestige of his credential, the court noted that: "'Revoke' means to annul or make void by recalling or taking back, cancel, rescind, repeal, reverse (see Black's Law Dictionary, 4th Ed.; *O'Hagan v. Kracke,* 165 Misc. 4 [300 N.Y.S. 351])." (*Id.*, at p. 427.)

The definition of "revoke" as that term is used in schoolteacher credential provisions of the Education Code to also mean "rescind" provides no authority for a similar definition of that term as it is used in parole provisions of the Penal Code. Leaving aside other distinctions between the two codes and the situations they regulate, the principal flaw in the purported analogy is that, unlike the parole provisions of the Penal Code and the case law pertinent thereto, the provisions of the Education Code and the case law pertaining to schoolteacher credentials do not make any distinction between revocation and rescission. While a law dictionary definition may therefore be an appropriate extrinsic aid to utilize in defining the scope of the revocation of a teaching credential, much better intrinsic aids are available to discern the meanings of and distinction between "revoke" and "rescind" as those terms are very differently employed in the statutes and administrative regulations that define the parole process.

*In re Clutchette, supra,* 39 Cal.App.3d 561, involved the power of the Adult Authority (a predecessor of the Board) to rescind previous actions fixing a prison term and setting a parole date. In the course of concluding that the authority acted within its jurisdiction, the court noted that in light of *In re Prewitt, supra,* 8 Cal.3d 470, "as far as procedural due process is concerned a rescission of an expected parole date is on a par with revocation of parole." (*Id.*, at p. 565.) The admitted similarities between the rescission of a parole date and the revocation of parole *"as far as procedural due process is concerned"* (italics added) does not compel the conclusion that the powers to rescind and revoke are themselves interchangeable nor certainly that one power is inherent in the other.

*In re Fain, supra,* 65 Cal.App.3d 376, focused upon the power of parole authorities to rescind a parole release date and what constitutes adequate "grounds" or "cause" to do so. In this context, the court observed that the power to rescind is "an adjunct" of the plenary power to revoke. (65 Cal.App.3d at p. 392.) An "adjunct" is "something joined or added to another thing but not essentially a part of it." (Webster's Third New Internat. Dict. (1970).) Therefore, to state in passing, as the court did in *Fain,*

that one power is "an adjunct" of another is by no means to equate the two for all purposes, nor to indicate that an individual or agency which possesses one also possesses the other.

Our conclusions that the power to rescind a parole release date is an aspect of the power to grant or withhold such a date, that such power is separate and distinct from the power to revoke parole, and that the power to rescind is not a gubernatorial power, are based primarily on our determination of the plain meaning of the language of the relevant statutes. These conclusions are, however, also logically consistent with the nature of the parole process.

The granting and rescinding of a parole date necessarily occurs during that phase of the parole process in which the prisoner is still in physical custody. The revocation of parole necessarily occurs during a later phase in which the prisoner, though still in legal custody, is no longer in physical custody. Since the factors that warrant parole revocation ordinarily occur when the inmate is "outside the prison walls and enclosures" and may therefore come to the attention of the public and the Governor as well as that of the Board, the legislative grant of authority to revoke to both the Board and the Governor serves an apparent purpose, as illustrated by the legislative history we describe presently. On the other hand, facts justifying the postponement or rescission of a parole date must occur while the inmate is still imprisoned and are therefore far more certain than those warranting revocation to come solely to the attention of the Board. In such circumstances, the need to additionally authorize the Governor to rescind a parole date, which, as indicated, no California Governor has ever before asserted, is not nearly so apparent.

Moreover, if the Legislature intended the Governor to be so authorized it would presumably have prescribed applicable procedures similar to those prescribed for the Board in the exercise of its power to rescind (Pen. Code, § 3041.5, subds. (b)(3), (4)), or those prescribed in connection with the powers and duties of the Governor relative to clemency (Pen. Code, §§ 4800-4852.21) or would at least have indicated that the rescission procedures prescribed for the Board likewise apply to the Governor, as it did in connection with the power to revoke (Pen. Code, §§ 3062-3065). The fact that the Legislature has not indicated the procedures to be followed by the Governor when rescinding a parole release date further reinforces the conclusion that the Legislature never intended to authorize the Governor to rescind a parole release date.

### III.

The legislative history of Penal Code section 3062 and the wider historical circumstances of its enactment, which "are legitimate and valuable aids in

divining the statutory purpose" (*California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836]), demonstrate that when it originally enacted the provision that is today embodied in Penal Code section 3062 the Legislature did not intend to confer upon the Governor the power to rescind a parole release date. More specifically, the history discloses that the parole provisions here in issue were originally enacted as part of a concerted effort, by numerous Governors as well as by the Legislature, to facilitate the release of inmates from state prison. The creation of a gubernatorial power to limit such release—such as the power to rescind a release date previously granted by the parole authorities—would be inimical to such purpose and, as the legislative history indicates, was never sought by any chief executive or intended by any Legislature during the period in question.

The problem of prison congestion was a continual preoccupation of all California's early Governors. In 1859, for example, Governor John B. Weller stated in a message to the Legislature that San Quentin, then the only state prison, had nearly double the number of inmates it could suitably accommodate. (Sen. J. (10th Sess. 1859) p. 30.)[10] In light of conditions at the prison, which he characterized as "a disgrace to humanity," Governor Weller declared that "[u]nless something is done speedily to provide for the accommodation of this army of convicts, the Executive may be compelled to pardon some of them, with a view to their transportation beyond the State. The law of self-preservation may compel me to throw them upon other communities." (*Id.,* at p. 31.) This was no idle threat, for in his next biennial message the Governor acknowledged that failure of the Legislature to improve the conditions of "our wretched prison system" compelled him

---

[10]Governor Weller explained the causes of this congestion as follows: "The discovery of gold on this coast threw a large number of young men upon us, from the Atlantic States, raised under the parental roof, but finding that gold was then so easily obtained, forgot the lessons they had been taught, and became addicted to the vices (drinking and gambling) which in the early settlement of the State prevailed to such an alarming extent, and are now paying the penalty in the Prison. As many of them are there under fictitious names, their digrace [*sic*] is unknown to distant kindred and friends. But a majority of the convicts are foreigners by birth. Our proximity to the former penal colonies of Great Britain forced upon us a large number of the most desperate and hardened villains who ever disgraced human nature. The South and Central American States, and, indeed every portion of the habitable globe, contributed their share toward swelling this immense army of ruffians. Besides, Criminal Courts, in the early years of our State, owing to the prevalence of crime, sentenced prisoners for very long terms, and, consequently, many old cases are still on hand." (*Ibid.*)

Thirty-four years later, in 1893, then Governor Markham offered a somewhat different explanation: ". . . no one believes that the people of California possess less virtue than those of other States, or that we have more criminals in proportion [to other states] . . . . I believe it is due to two reasons: first, our statutes create such an exceedingly large number of State Prison offenses; second, because the Judges of this State, in their discretion, impose excessive sentences as compared with other States." (First Biennial Message of Governor H.H. Markham to the Leg. of Cal., 1 Appen. to Sen. & Assem. J. (30th Sess. 1893) p. 24.)

to act upon this "principle." (Sen. J. (11th Sess. 1860) p. 66.) The pressures that Governor Weller complained of continued to plague his successors, who also felt constrained to use the clemency power to reduce the size of prison populations.[11]

Finally, in 1893, as a more appropriate means of reducing the prison population, Governor H.H. Markham renewed the earlier recommendations of Governor George Stoneman and the State Penological Commission[12] that a parole system be enacted for the purpose, among others, of releasing "a large number of men who could be trusted to go upon their parole and thus save the State a very great expense." (First Biennial Message of Governor H.H. Markham to the Leg. of Cal., 1 Appen. to Sen. & Assem. J. (30th Sess. 1893) p. 24.) The Legislature quickly responded by enacting such a law that same year. (Stats. 1893, ch. 153, §§ 1 & 2, p. 183.[13]) This new law, which only applied to those serving a first prison term not under sen-

---

[11]See, e.g., the messages to the Legislature of Governor Frederick F. Low (Sen. J. (17th Sess., 1867-1868) pp. 38-39) and Governor H.H. Markham (Second Biennial Message of Governor H.H. Markham to the Leg. of Cal., 1 Appen. to Sen. & Assem. J. (31st Sess. 1895) pp. 21-22). As stated by Governor Markham, "[w]hen I reflect that there are confined in our State Prisons from two to three times as many prisoners as in any other State in the Union in proportion to our population, I am only too glad of a legitimate excuse to liberate applicants for pardon." (First Biennial Message of Governor H.H. Markham to the Leg., 1 Appen. to Sen. & Assem. J. (30th Sess. 1893) p. 24.) The use of the pardon power to relieve prison congestion, which was heavily criticized (see, e.g., S.F. Chronicle (Dec. 14, 1886) p. 4, col. 1), appears to have been effectively ended by Governor James N. Gillett, who in 1907 "adopted the . . . rule that no person eligible to parole, other than one establishing his innocence of crime, should be pardoned until he had first applied for and received a parole." (First Biennial Message of Governor James N. Gillett to the Leg. of Cal., 1 Appen. to Sen. & Assem. J. (38th Sess. 1909) p. 8.)

[12]Biennial Message of Governor George Stoneman to the Legislature of California, 1 Appendix to the Journals of the Senate and Assembly (27th Sess. 1887) page 12. For evidence that even beyond the turn of the century parole continued to be perceived as one of the best means "of lessening the congestion consequent upon having too many prisoners and too few cells to put them in," see the Second Biennial Message of Governor George C. Pardee to the Legislature of California, 1 Appendix to the Journals of the Senate and Assembly (37th Sess. 1907) page 18. For brief gubernatorial synopses of the early history of the California parole system, see the Second Biennial Message of Governor James N. Gillett to the Legislature of California, Journal of the Assembly (39th Sess., 1911) page 22, and Second Biennial Message of Governor Hiram W. Johnson to the Legislature of the State of California, Journal of the Senate (41st Sess. 1915) pages 34-35.

[13]The statute, which was approved on March 23, 1893, provided in its entirety as follows: "Section 1. The State Board of Prison Directors of this State shall have power to establish rules and regulations under which any prisoner who is now or hereafter may be imprisoned under a sentence other than for murder in the first or second degree, who may have served one calendar year of the term for which he was convicted, and who has not previously been convicted of a felony, and served a term in a penal institution, may be allowed to go upon parole outside of the buildings and inclosures, but to remain while on parole in the legal custody and under the control of said Board of State Prison Directors, and subject at any time to be taken back within the inclosure of said prison; and full power to make and enforce such rules and regulations, and to retake and imprison any convict so upon parole, is hereby

tence for murder in the first or second degree, provided that only the State Board of Prison Directors could revoke or, in the words of the statute, "retake and imprison any convict so upon parole." (*Ibid.*) No such power was conferred upon the Governor.

In 1901, Governor Henry T. Gage advised the Legislature that he frequently received seemingly worthy appeals for clemency from prisoners ineligible for parole; i.e., repeat offenders or those convicted of murder. "Yet, as the conduct of such prisoners would not without a test justify the Executive in granting a full or even a conditional pardon, it would appear just that such prisoners should be tried by a limited parole *with full power on the part of the Executive at any time of terminating the parole granted by the State Board of Prison Directors.*" (First Biennial Message of Governor Henry T. Gage to the Leg. of Cal., 1 Appen. to Sen. & Assem. J. (34th Sess. 1901) p. 40. Italics added.) In response to this request, the Legislature on February 28, 1901, amended the 1893 statute.

The 1901 statute (Stats. 1901, ch. 114, §§ 1 & 2, p. 82), which is set forth in its entirety in the margin below,[14] incorporated most provisions of

conferred upon said Board of Directors, whose written order, certified by the President of said Board, shall be a sufficient warrant for all officers named therein to authorize such officer to return to actual custody any conditionally released or paroled prisoner; and it is hereby made the duty of all Chiefs of Police and Marshals of cities and villages, and the Sheriffs of counties, and of all police, prison, and peace officers, and constables, to execute any such order in like manner as ordinary criminal process. If any prisoner so paroled shall leave the State without permission from said Board, he shall be held as an escaped prisoner, and arrested as such. [¶] Sec. 2. This Act shall take effect immediately."

[14]"Section 1. Section one of an act entitled an act to establish board of parole commissioners for the parole of and government of paroled prisoners, approved March twenty-third, eighteen hunded and ninety-three, is hereby amended so as to read as follows: [¶] The state board of prison directors of this state shall have power to establish rules and regulations under which any prisoner who is now or hereafter may be imprisoned in any state prison, and who may have served one calendar year of the term for which he was convicted, and who has not previously been convicted of a felony and served a term in a penal institution, may be allowed to go upon parole outside of the buildings and enclosures, but to remain while on parole in the legal custody and under the control of the state board of prison directors, and subject at any time to be taken back within the enclosure of said prison; and full power to make and enforce such rules and regulations and retake and imprison any convict so upon parole is hereby conferred upon said board of directors, whose written order certified by the president of said board shall be a sufficient warrant for all officers named therein to authorize such officer to return to actual custody any conditionally released or paroled prisoner, and it is hereby made the duty of all chiefs of police, marshals of cities and villages, and sheriffs of counties, and all police, prison, and peace officers and constables to execute any such order in like manner as ordinary criminal process; *provided, however,* that no prisoner imprisoned under a sentence for life shall be paroled until he shall have served at least seven calendar years. The governor of the state shall have like power to cancel and revoke the parole of any prisoner, and his written authority shall likewise be sufficient to authorize any of the officers named therein to retake and return said prisoner to

the 1893 statute and was then the only California statute on the subject of parole. It differed from the 1893 enactment in only two significant respects: first, it made first term prisoners serving life sentences for murder in the first or second degree eligible for parole after having served at least seven calendar years; and, second, it conferred upon the Governor the "like power to cancel and revoke the parole of any prisoner." This latter provision gave the Governor what he requested: the power to terminate an executed grant of parole, not a release date, he believed improvidently granted.[15]

In enacting the 1901 statute, which is the genesis of present Penal Code section 3062, the Legislature, like Governor Gage, recognized that the extension of parole to convicted murderers created risks to the public warranting concomitant extension of the power to revoke parole. Such public risks, it bears emphasis, related only to parolees, who by definition were outside the prison walls. This rationale for extending to the Governor the power to revoke parole, which is the only rationale apparent from the available legislative history, obviously did not relate to prisoners still in prison, who presented no greater danger to the public as a result of the 1901 statute than they did previously. Moreover, as explained by Governor Gage when he requested its enactment, the principal purpose of the 1901 statute was to *increase* the number of convicts released from prison on parole.[16] Facilitating the rescission of a parole release date, which would have the opposite effect, is inconsistent with this purpose and therefore cannot be deemed within the then Governor's and the Legislature's intent when the gubernatorial right to revoke parole was originally sought and granted. In short, the legislative history suggests no reason nor any intent to confer upon the Governor the authority to rescind the release date of a prisoner still in

the state prison, and his written order canceling or revoking the parole shall have the same force and effect and be executed in like manner as the order of the state board of prison directors. If any prisoner so paroled shall leave the state without permission from said board he shall be held as an escaped prisoner and arrested as such. [¶] Sec. 2. This act shall take effect immediately from and after its passage." (Italics in original.)

[15]Pursuant to a statute first enacted in 1915 (Stats. 1915, ch. 573, §§ 1 & 2, p. 981; see also Stats. 1929, ch. 872, §§ 1 & 2, p. 1930), the terms of which are today set forth in Penal Code section 3063, no parole shall be revoked (by the Governor or by the Board) "without cause, which cause must be stated in the order suspending or revoking the parole." (See, *In re Knaesche, supra*, 22 Cal.App.2d at p. 669; see also *People* v. *Anderson* (1975) 49 Cal.App.3d 869, 873 [123 Cal.Rptr. 209].) Presumably, such cause must occur while the inmate is actually on parole or constitute facts unknown by the Board at the time of release on parole.

[16]The trend to increase the number of convicts released upon parole led, in 1909, to the enactment of a statute extending parole eligibility from only those serving a first term to "any person who has been, or who shall hereafter be, sentenced to the state prison . . . under the restrictions now provided by law for the parole of first term prisoners, any act to the contrary notwithstanding." (Stats. 1909, ch. 236, § 1, p. 364.) This statute, like the parole statutes of 1893 and 1901, was enacted at the express request of the Governor. (See First Biennial Message of Governor James N. Gillett to the Leg. of Cal., 1 Appen. to Sen. & Assem. J. (38th Sess. 1909) p. 8.)

physical custody. In this connection, it is clear that the Governor's "like power to cancel and revoke" pursuant to the 1901 statute refers to the Board of Prison Directors' power, under both the 1893 and 1901 statutes, to "retake and imprison any convict . . . upon parole," words that cannot reasonably be understood to apply at all to convicts still in prison.

The history just described, in addition to the clear meaning of the present parole provisions earlier discussed upon which we primarily rely, support the previously expressed view of this court, which we reaffirm, that "[the Board], *not the Governor*, has discretion in fixing . . . [a] term and granting *or withholding* parole." (*Azeria* v. *California Adult Authority, supra,* 193 Cal.App.2d 1, 5, italics added.) Accordingly we hold that neither Penal Code section 3062 nor any other source of law provides authority for gubernatorial rescission of the parole release date of an inmate, like petitioner, still in physical custody.[17]

The executive order issued by the Governor expressly orders the suspension of Fain's parole release date "until a parole rescission hearing can be held by [his] representative and a decision reached by [him] as to William Archie Fain's suitability for parole." Since, as stated, the Governor does not possess the power to withhold a parole release date, which power is committed exclusively to the Board, the Governor has acted in excess of his jurisdictional authority.

The writ of habeas corpus is granted. Petitioner shall be discharged from the custody of the California Department of Corrections, subject, however, to the parole heretofore granted petitioner and the conditions and restrictions contained therein.

Miller, J., concurred.

**ROUSE, J.**—I respectfully dissent.

Contrary to the position taken by the majority, my analysis of the parole provisions of the Penal Code does not persuade me that the power to rescind a parole release date arises from the power to grant parole rather than to revoke it. Nor do I agree that the power to rescind a parole release date is one possessed exclusively by the Board of Prison Terms (Board).

---

[17]In light of our conclusion that the Governor has no legal authority to rescind a parole release date, we need not of course address the question whether, if he did possess such authority, the prior action of the board and our decision in *In re Fain, supra,* 139 Cal.App.3d 295 are res judicata (see *In re Crow* (1971) 4 Cal.3d 613, 623 [94 Cal.Rptr. 254, 483 P.2d 1206]) and would nonetheless operate to collaterally estop the Governor from rescinding petitioner's release date. (See *People* v. *Sims* (1982) 32 Cal.3d 468 [186 Cal.Rptr. 77, 651 P.2d 321].)

The majority's construction of the parole provisions of the Penal Code is based primarily upon the fact that sections 3041.5 and 3041.7 are the only provisions in the Penal Code that specifically refer to the rescission of a parole release date. However, the majority overlooks the fact that these sections do not purport to *create* the power to rescind a parole release date; rather, they acknowledge, by implication, the *existence* of such power and merely prescribe the procedure for its exercise. The source of that power lies elsewhere and, in my opinion, arises from the power to revoke parole, which is possessed equally by the Board and by the Governor, pursuant to sections 3060 and 3062 of the Penal Code.

In *In re McLain* (1960) 55 Cal.2d 78, 80-81 [9 Cal.Rptr. 824, 357 P.2d 1080], the Adult Authority (a predecessor of the Board) fixed the petitioner's prison term and set his parole release date for November 17, 1958. However, the Adult Authority later learned that the prison disciplinary committee had found the petitioner guilty of complicity in a knifing which took place in the prison where he was confined. (*Id.,* at pp. 81-86.) The Adult Authority then rescinded its prior order. The California Supreme Court held that this latter order by the Adult Authority could not be read as an order which merely suspended parole pending further investigation, but was clearly an order of "revocation." (*Id.,* at pp. 85-87.)

In a valiant effort to substantiate its position, the majority engages in an extensive discussion of what, in my perception, is a distinction without a real difference, namely, the Legislature's use of the words "revoke" and "rescind." Several California cases suggest, by their use of those terms, that they are interchangeable and, in their practical application, mean the same thing (e.g., *In re Fain* (1976) 65 Cal.App.3d 376 [135 Cal.Rptr. 543]; *In re Clutchette* (1974) 39 Cal.App.3d 561 [114 Cal.Rptr. 509]; *Vogulkin v. State Board of Education* (1961) 194 Cal.App.2d 424 [15 Cal.Rptr. 335]).

I find further support for my conclusion that the rescission of a parole release date is essentially an exercise of the power to revoke parole in *In re Fain, supra,* 65 Cal.App.3d 376, 391-392, where the court, citing *In re McLain, supra,* 55 Cal.2d 78, 84-87, stated that the power to rescind a parole release date had been recognized by the courts "as an adjunct of the [Adult Authority's] plenary power to 'suspend, cancel or revoke any parole,' pursuant to [Pen. Code] section 3060 . . . ." Here, the majority has attempted to avoid the effect of that language by resorting to a dictionary definition of "adjunct" as "something joined or added to another thing but not essentially a part of it." (Majority opn., *ante,* p. 551.) In my opinion, the majority has choosen to construe this language in a narrow, constricted fashion, placing undue emphasis upon the words "not essentially a part of

it." Of far greater significance, I believe, is the fact that the *Fain* court found the rescission of a parole release date to be an adjunct of the power to suspend, cancel or revoke *rather than an adjunct of the power to grant parole*. Thus the more reasonable construction of the *Fain* court's language is that the power to suspend or rescind a parole release date stems from the power to revoke.

Nor do I find persuasive the majority's reliance upon *Azeria* v. *California Adult Authority* (1961) 193 Cal.App.2d 1 [13 Cal.Rptr. 839]. Although that case does contain a statement that the Adult Authority, not the Governor, has the discretion to fix a defendant's prison term and grant or withhold parole (*id.,* at p. 5), that language is, at best, a gratuitous assertion. In that case, the Governor had made no attempt to exercise the power to revoke parole but merely expressed his desire that where there was a possibility that a prisoner might succeed on parole, he should be released. (*Id.,* at p. 4.) As far as can be determined from a reading of *Azeria,* section 3062 of the Penal Code was never brought to the court's attention nor considered by it.

Even if it could be said that the power to rescind a parole release date is not inherent in the power to revoke, I view this case as one which should be decided in accordance with the time-honored rule that the law will not require an idle or futile act. (Civ. Code, § 3532; *People* v. *Redmond* (1981) 29 Cal.3d 904, 917 [176 Cal.Rptr. 780, 633 P.2d 976]; *M.C.A.* v. *State of California* (1982) 128 Cal.App.3d 225, 238 [181 Cal.Rptr. 404].) The majority concludes that "the sole power relative to parole that the Governor shares with the board is the power to revoke the parole of a prisoner no longer in physical custody." (Majority opn., *ante,* pp. 548-549.) Thus it is conceded that section 3062 of the Penal Code authorizes the Governor to revoke parole, for good cause, once a prisoner steps outside the prison gates. Such being the case, it seems pointless to hold that the Governor must wait for the parolee's first step outside the confines of prison before taking action based upon information leading him to believe that the prisoner is not a suitable subject for parole.

Also, I cannot agree with petitioner's assertions that the Governor's executive order is an unconstitutional suspension of the writ of habeas corpus, or that it is in violation of the doctrine of separation of powers or that it is barred by the doctrine of res judicata or collateral estoppel. All of these arguments assume that the Governor intends to make his own decision as to Fain's parole release date based upon information which has already been considered by the Board. In my opinion, this assumption is erroneous. As the majority has itself observed, neither the Board nor the Governor may revoke or suspend parole without cause, and in an instance such as that now

before us, such cause presumably consists of facts unknown to the Board at the time of its decision. (Majority opn., *ante,* p. 556, fn. 15.) At this stage of the proceedings, when the precise nature of the information possessed by the Governor is a matter for pure speculation, we must presume that the Governor's official duty has been regularly performed (Evid. Code, § 664) and that he has come into possession of new information, not previously brought to the Board's attention, which would establish good cause for a revocation of Fain's parole.[1]

I would deny the petition.

Respondent's petition for a hearing by the Supreme Court was denied September 30, 1983. Richardson, J., was of the opinion that the petition should be granted.

---

[1]Of course, we must point out that the matter of public outcry has been put to rest by this court; hence it may not constitute the sole basis for revocation of parole.